IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF ARIZONA

| | | |
|---|---|---|
| United States of America, | ) | CR 15-00768-TUC-JAS(EJM) |
| Plaintiff, | ) | |
| | ) | |
| vs. | ) | **REPORT AND RECOMMENDATION** |
| | ) | **ON DEFENDANT'S MOTIONS TO** |
| David Cano, | ) | **SUPPRESS** |
| Defendant. | ) | |
| _____ | ) | |

Pending before the Court are the defendant's Motions to Suppress Evidence and Statements obtained in violation of the Fourth Amendment and *Corley v. United States*.  The defendant seeks to suppress evidence obtained from the warrantless search of his cell phone and statements he made both on the day of his arrest and the following day because the statements were tainted by the illegal search.  The defendant also seeks to suppress his statements made the day after his arrest because he was not timely presented for his Initial Appearance on the day of his arrest.  For the reasons that follow, this Court recommends that both of these motions be denied.

**The Defendant's Arrest and Pending Charges**

On March 25, 2015, the defendant, David Cano, was arrested at the DeConcini Port of Entry ("POE") in Nogales, Arizona and charged in a criminal complaint with possession with the intent to distribute methamphetamine in violation of 18 U.S.C. 841(a)(1) and 841(b)(1)(C). [Doc. 1.]   The criminal complaint alleges that at approximately 7:30 a.m. on March 25, 2015, the defendant attempted to enter the United States from Mexico at the Nogales POE driving a Ford pick-up truck which was found to contain 12.18 kilograms of

1   methamphetamine concealed in the firewall of the truck.[1]  The complaint further alleges that

2   when attempting to enter the United States, the defendant told a U.S. Customs and Border

3   Protection Officer that he crosses the border every day and was going to Nogales, Arizona

4   to pay bills.  However, after being advised of and waiving his Miranda rights, the defendant

5   told law enforcement that he was actually crossing into the United States to pick up money,

6   which he assumed was drug money, from the Phoenix area and transport it back to Mexico.

7   On April 22, 2015, a federal grand jury in Tucson, Arizona returned a four-count indictment

8   charging the defendant with the following offenses: conspiracy to possess with intent to

9   distribute methamphetamine; possession with intent to distribute methamphetamine;

10  conspiracy to import methamphetamine; and importation of methamphetamine.

11  **The Instant Motions**

12         The defendant has filed two motions to suppress evidence obtained from the search

13  of his cell phone as well as statements made the day of his arrest and the following day.  The

14  defendant contends that the search of his cell phone violated the Fourth Amendment because

15  it was conducted without a warrant and there are no exceptions to the warrant requirement.

16  With respect to the statements made on the day of his arrest and the following day, the

17  defendant first contends that they should be suppressed because the statements were tainted

18  by agent's use of the results of the illegal cell phone search during the defendant's

19  interrogations.  The defendant also argues that his statements made to law enforcement the

20  day after his arrest should be suppressed because he was not timely presented for his Initial

21  Appearance on the day of his arrest.

22         The government argues that this was a legal border search of the cell phone and for

23  that reason both the information extracted from the cell phone and the defendant's statements

24  regarding this cell phone information were lawfully obtained.   The government also argues

25  that there was no unreasonable or unnecessary delay in presenting the defendant for his

26  Initial Appearance which would warrant the suppression of his statements made the day after

27

28

[1] The complaint does not state whether this was the defendant's vehicle.

1    his arrest.

2                        **Evidence Presented at the Hearing on the Motions**

3           At the evidentiary hearing on the motions to suppress, the government presented one

4    witness, Special Agent Jordan Oliveira, who testified as follows.  Agent Oliveira has been

5    employed by the Department of Homeland Security ("HSI") for the past five years. (Tr. 6.)[2]

6    His duties include the investigation of federal criminal offenses, primarily narcotics and

7    immigration offenses.  (*Id*.)  At the time of the arrest at hand, he had participated in between

8    50 and 100 cases involving the importation of narcotics into the United States.  (*Id*.)

9           Between 7:30 a.m. and 8:00 a.m. on March 25, 2015, Agent Oliveira received a phone

10   call from Inspectors at the DeConcini POE in Nogales, Arizona alerting him about a drug

11   seizure involving the defendant.  (*Id*. 7.)  He and another agent then traveled from their office

12   in Rio Rico to the POE to investigate the drug seizure.  (*Id*. 7, 14.)  He testified that it takes

13   about 15 minutes to get from his office to the POE, and estimated that he arrived at the POE

14   around 8:00 a.m. or shortly thereafter.  (*Id*. 14.)  Upon his arrival, he met with some of the

15   Inspectors involved in the drug seizure who briefed him on the information pertinent to the

16   seizure. (*Id*. 8.)  The Inspectors told Agent Oliveira that the defendant's truck was referred

17   to the secondary inspection area where it was sent through an x-ray machine.  (*Id*.) The x-ray

18   revealed anomalies in the firewall area of the truck and narcotics K-9 alerted to the firewall

19   area.  (*Id*.)  A search of the firewall revealed 21 packages of methamphetamine which

20   weighed 12.18 kilograms. (*Id*. 10.)  Inspectors also told Agent Oliveira that they recovered

21   two cell phones that belonged to the defendant.  (*Id*. 9.)

22          Agent Oliveira testified that in his experience drug smugglers use cell phones to

23   communicate and coordinate the delivery of narcotics.  (*Id*. 9.)  Moreover, the presence of

24   multiple cell phones was significant because drug smugglers often have a personal phone as

25   well as a second phone which is used primarily for drug trafficking activity.  (*Id*. 9-10.)

26   Additionally, Agent Oliveira already had some information about the defendant's prior

27   _____

28          [2] "Tr." refers to the transcript of the evidentiary hearing on the suppression motions held on
     February 4, 2016.

1   criminal activity including: (1) the defendant's 2006 conviction for narcotics trafficking; (2)

2   a 2014 incident in San Ysidro; (3) the defendant's travel from Phoenix to Baltimore; and (4)

3   a "look out" for the defendant which had been placed into a computer database by another

4   agent in the event that the defendant tried to cross into the United States.  (*Id*. 8, 38-42.)

5       For all of these reasons, Agent Oliveira and his fellow agent utilized a Cellebrite

6   UFED machine in an attempt to extract information from the cell phones which may be

7   relevant to this drug offense. (*Id*. 9-12.)  Agent Oliveira explained that a USB cable is

8   plugged into the cell phone and the Cellebrite machine to extract the phone's data.  (*Id*. 9.)

9   The extracted data includes: contacts saved on the phone, text messages, call logs of

10  incoming/outgoing calls and the duration of those calls.  (*Id*. 12.)  Agent Oliveira further

11  explained that the extracted data was essentially the same information that would be obtained

12  if an agent (or the defendant) simply scrolled through the contact list, text messages, and calls

13  received/made on the phone.  (*Id*. at 94.)   The data extraction was  successful for one phone

14  which had a U.S.-based number, but was unsuccessful for the cell phone which had a

15  Mexico-based number.  Agent Oliveira printed out the data extracted from the one phone,

16  which amounted to about twenty pages of information.   (*Id*. 11, 48-49, 57.)[3]

17      After completing the Cellebrite search (and attempted search) of the cell phones,

18  Agent Oliveira had the defendant removed from a holding cell at the POE and took him to

19  an office above the POE in order to conduct an interview.  (*Id*. 14-15.) The interview began

20  at 10:48 a.m. (*Id*. 25.)  Agent Oliveira testified that between the time he arrived at the POE

21  and the start of the interview, he was conducting his investigation, which included speaking

22  with Port Inspectors -- many of whom were performing their assigned duties and were not

23  immediately available to meet with him -- about the drug seizure and statements made by the

24  defendant upon his arrival at the Port of Entry, examining the vehicle and the results of the

25

26      [3]   On direct examination, Agent Oliveira testified that he believed the Cellebrite extraction
27  started somewhere between 8:00  a.m. and 9:00  a.m. and took approximately 25 minutes.  (*Id*. 12-
    14)  On cross-examination, after being shown the printout of the data extracted from the one phone,
28  Agent Oliveira agreed with defense counsel that data extraction began at 10:11 a.m. and took 8 to
    9 minutes.  (*Id*. 46-47.)

x-ray of the vehicle, conducting the Cellebrite search of the cell phones, and getting his paperwork ready for the interview. (Tr. 91-92.) After introducing himself and showing the defendant his credentials, Agent Oliveira advised the defendant of his Miranda rights by both reading the rights from a pre-printed form and allowing the defendant to read the form. (*Id*. 15-19.) The defendant said that he understood his rights, had no questions, and was willing to answer questions without a lawyer present. (*Id*. 18.) The defendant also initialed and signed the rights form in the appropriate places indicating that he understood his rights and waived his right to counsel. (*Id*. 18-19.)

Agent Oliveira testified that he brought the twenty-page printout of the data extracted from the one cell phone to the interview with the defendant, but he is unsure of whether he actually referred to that material during his interview. (*Id*. 20.) That is because the defendant was extremely cooperative both in terms of providing information about why he was entering the United States, and in scrolling through the calls, text messages, and contact lists on both phones, and providing agents with information about the calls/text messages and persons involved in drug and currency smuggling. (*Id*. 22-26). The interview concluded at 12:20 p.m. because Agent Oliveira thought he had obtained sufficient information to establish probable cause that the defendant had committed a drug trafficking offense. (*Id*. 26-27, 67, 88.) Agent Oliveira did ask the defendant if he would be willing to continue to cooperate and the defendant stated that he would do so. (*Id*. 27.)

Agent Oliveira then transported the defendant to the HSI office in Rio Rico to fingerprint him and enter biographical information into that computer system. (*Id*. 27-28.) That is standard practice with any person arrested at the POE, and this process cannot be done at the POE. (*Id*. 28.) The drive from the POE to the office in Rio Rico takes about 15 minutes, and Agent Oliveira's best estimate is that they arrived at the Rio Rico office around 1:00 p.m. (*Id*. 28, 61.) Agent Oliveira testified that it took about an hour to complete the fingerprinting and biographical information. (*Id*. 66.)

1    Agent Oliveira then took the defendant to the Santa Cruz County jail for the night.[4]

2    (*Id*. 66.)  Agent Oliveira testified that the Santa Cruz County Jail is the primary holding

3    facility for U.S. citizens arrested at the Nogales POE.  (*Id*. 29.)  He further testified that

4    because the defendant's interview did not conclude until 12:20 p.m and he still had to take

5    the defendant for processing at the Rio Rico office, he would not have been able to get the

6    defendant to court in Tucson for Initial Appearances at 2:00 p.m. (*Id*. 29-31.)  The drive

7    from the Rio Rico office to Tucson is about an hour and fifteen minutes. (*Id*. 29.)  However,

8    Agent Oliveira explained that the notification procedure for Initial Appearances set up by the

9    court in Tucson requires agents to call in the arrest prior to 10:30 a.m. in order to get the

10   defendant put on the 2:00 p.m. Initial Appearance calendar.[5] (*Id*. 30.)  Moreover, U.S.

11   citizens like the defendant have to be at the Pretrial Services Office by 11:30 a.m. to be

12   interviewed by a Pretrial officer.  (*Id*. 30-31.)  None of those time restrictions could be

13   complied with given the time that the interview was completed, and the need to take the

14   defendant to the Rio Rico office for processing.[6]  (*Id*. 28, 30-31.)

15       The following morning, at around 8:50 a.m., Agent Oliveira picked up the defendant

16   from the Santa Cruz County Jail and transported him to the Rio Rico office.  (*Id*. 31-32.)

17   Agent Oliveira testified that he likes to pick up prisoners as early as possible from the jail in

18   case there is a long wait for a prisoner.  (*Id*. 31.)  He further testified that he took the

19

20

21       [4] Defense counsel told Agent Oliveira that Santa Cruz County Jail records reflect that the
     defendant was not logged into the jail until 4:58 p.m., and asked if the agent disputed that time.
22   Agent Oliveira did not dispute that log in time, but did note that he did not know when the jail
     "logged" a prisoner into the jail - *i.e.*, when they take custody of the prisoner from the agent or when
23   the jail is completed with their paperwork.  He also testified that there is a waiting area in the jail
     where agents sit with the prisoner until the jail officials are ready to take custody, although he does
24   not recall how long he and the defendant may have waited in that area.  (Tr. 67.)

25       [5] General Order 12-19 sets forth the advance notification procedure for Initial Appearances
     in the Tucson Division, which is quoted in the Government's Response in Opposition to the
26   Defendant's Motions to Suppress. [Doc. 32 at 7 n. 2.]

27       [6] In response to the Court's question, Agent Oliveira testified that he did not make a call to
28   the courthouse to see if the defendant's Initial Appearance could be conducted later in the afternoon.
     (*Id*. 95.)

1   defendant to the Rio Rico office essentially to kill time, because otherwise he would have
2   had to sit in his car with the defendant outside of the Courthouse for an hour or more.  (*Id*.
3   32.)  He explained that agents are not allowed to bring prisoners into the Courthouse until
4   at or around 11:30 a.m. when they are interviewed by Pretrial Services. (*Id.* 31-32.)  Agent
5   Oliveira further explained that he often follows this same procedure of taking a prisoner from
6   the Santa Cruz County Jail to the Rio Rico office because of the timing/convenience
7   considerations discussed above, and to determine if there are other prisoners at the Rio Rico
8   office who also need to be transported to federal court that morning.  (*Id*. 31.)

9        While Agent Oliveira and the defendant were at the Rio Rico office, the defendant
10   told the agent that he had some additional information that he recalled and wanted to share.
11   (*Id*. 32.) Agent Oliveira testified that he reminded the defendant of his rights and asked if he
12   understood them and wanted to again talk without an attorney.  (*Id.*)  The defendant said that
13   he understood his rights and wanted to share this additional information, which pertained to
14   identifying a possible narcotics stash house.  (*Id*. 32-33.)  Agents asked if the defendant
15   would discuss some text messages on one of the phones and the defendant agreed to do so.
16   (*Id*. 34.)[7]  This conversation lasted about 25 minutes and then Agent Oliveira transported the
17   defendant to the federal court in Tucson for his interview with Pretrial Services and his Initial
18   Appearance.  (*Id*. 35.)

19                                    **DISCUSSION**
20                              **Search of the Cell Phone**

21        The defendant argues that the Cellebrite data extraction from the cell phone was an
22   illegal search because it was conducted without a search warrant and there are no exceptions
23   to the warrant requirement.   As such, the defendant argues that the data obtained from that
24   search should be suppressed, as should his statements regarding any information obtained
25   from the phone because those statements were tainted by the illegal search.[8]  The government

26   _____

27        [7] Agent Oliveira did not recall if either phone was password-protected.  (*Id*. 34.)

28        [8]  In the defendant's post-hearing Supplemental Memorandum, for the first time he claims
     that his statements were involuntary because they were "the product of a skilled psychological

1   argues that no warrant was required because this was a valid border search, therefore, the

2   evidence obtained from the phone and the defendant's statements about the cell phone

3   information were lawfully obtained.  This Court agrees that this was a valid border search

4   that did not require a search warrant.[9]

5       In *United States v. Cotterman*, 709 F.3d 952, 960, 968-970 (9th Cir. 2013 (*en banc*),

6   the Ninth Circuit held that a cursory, warrantless border search of an electronic storage

7   device (a laptop computer in that case) is permissible, but a more exhaustive forensic search

8   must be supported by some reasonable suspicion that evidence of a crime is on the device.

9   Here, even if the Cellebrite data extraction is considered a forensic search of the cell phone,

10  it was supported by reasonable suspicion that evidence of narcotics trafficking would be

11  found on the phone.  *See United States v. Cortez*, 449 U.S. 411, 417–18 (1981) (reasonable

12  suspicion is defined as a particularized and objective basis for suspecting the particular

13  person stopped of criminal activity made in light of the totality of the circumstances).

14      The defendant had just been arrested for attempting to smuggle 12.18 kilograms of

15  methamphetamine into the United States.  Agent Oliveira testified that in his experience drug

16  smugglers use cell phones to communicate and coordinate the delivery of narcotics.  (Tr.  9,

17  94-95.)  Moreover, he testified that the presence of two cell phones – one of personal use and

18

19  coercion."  (Doc. 57 at 7.)   The defendant does not point to explicit coercion, but rather refers to
20  the fact that Agent Oliveira was investigating the defendant prior to March 25, 2015, had
    information about his prior conviction and involvement in a 2014 incident, and the agent's use of
21  the cell phone data at the interviews.  In the government's post-hearing Supplemental Memorandum,
    they note that during the evidentiary hearing defense counsel asked Agent Oliveira questions that
22  implied that the defense may also be arguing that the defendant's statements should be suppressed
23  for the following reasons:  (1) that the re-advisal of Miranda rights for the second interview was
    insufficient; and (2) the agent's statements to the defendant about cooperation was coercive.  Neither
24  argument is made by the defense, although the latter does go to the defendant's argument about a
    coercive interview.  Even though none of these arguments were presented to the Court prior to the
25  evidentiary hearing, the Court has considered all of these arguments and finds that Agent Oliveira's
26  testimony established that the defendant still understood and wanted to waive his Miranda rights for
    the second interview, and that nothing about Agent Oliveira's preparation for the interview or his
27  questioning of the defendant resulted in a coercive interview.

28      [9] Both parties pointed out that a search warrant for both cell phones was subsequently
    obtained.  The validity of that search warrant has not been challenged in the instant motions.

1   the other for narcotics smuggling – was consistent with the modus operandi of a drug courier.

2   (*Id.* 9-10.)  Finally, Agent Oliveira testified that, prior to the defendant's arrest on March 25,

3   2015, law enforcement had information that the defendant had a prior drug conviction, he

4   was involved in prior illegal criminal activity, and a "look out" for the defendant had been

5   entered into a law enforcement computer database.  (*Id.* 8, 38-42.)

6         The totality of these circumstances establish a reasonable suspicion that evidence of

7   narcotics trafficking may exist on the cell phone.  As such, the Cellebrite search of the phone

8   – whether that search was a cursory search or a forensic search – was a lawful border search

9   and the defendant's statements about the information on the phones was not tainted by an

10  illegal search.[10]  For those reasons, the Court recommends that the motion to suppress based

11  on a warrantless search of the cell phone be denied.

12                **Delay in Bringing the Defendant to His Initial Appearance**

13        The defendant argues that his statements made at the second interrogation on March

14  26, 2015 should be suppressed because they were outside the six-hour "safe harbor"

15  provision of 18 U.S.C. § 3501 and must be presumed to have been involuntarily made.  The

16  government argues that it was logistically infeasible for arresting agents to present the

17  defendant for his Initial Appearance on March 25, 2015, so the delay in bringing the

18  defendant to court for this hearing the following day was not unreasonable or unnecessary.

19  As discussed below, both the timing and the location of the defendant's arrest in relation to

20  the district court in Tucson establish that the delay in presentment was reasonable.  As such,

21  it is recommended that the motion to suppress on this ground be denied.

22        Federal Rule of Criminal Procedure 5(a) mandates that "[a] person making an arrest

23  within the United States must take the defendant without unnecessary delay before a

24  magistrate judge . . . ."  In *McNabb v. United States*, 318 U.S. 332 (1943) and *Mallory v.*

25  *United States*, 354 U.S. 449 (1957), the Supreme Court held  that "an arrested person's

26  _____

27        [10]  The defendant's reliance on *Riley v. California*, 134 S.Ct. 2473 (2014) and *United States*
28  *v. Lara*, 2016 WL 828100 (9th Cir. 2016) is misplaced as neither the Supreme Court nor the Ninth
    Circuit were dealing with a border search of a cell phone, but rather, warrantless searches of a cell
    phone incident to arrest.

1    confession is inadmissible if given after an unreasonable delay in bringing him before a

2    judge." *United States v. Valenzuela-Espinoza*, 697 F.3d 742, 748 (9th Cir. 2012).  "Congress

3    enacted 18 U.S.C. 3501(c) in response to the *McNabb-Mallory* rule."   *United States v.*

4    *Pimental*, 755 F.3d 1095, 1100 (9th Cir. 2014).  That statute "provides a six-hour 'safe

5    harbor' period during which a confession will not be deemed inadmissible solely because of

6    a delay in presentment to a magistrate." *Valenzuela-Espinoza*, 697 F.3d at 748.  The six-hour

7    limitation under § 3501(c) does not apply, however, where "the delay in bringing [the

8    defendant] before [a] magistrate judge . . . beyond such six-hour period is found by the trial

9    judge to be reasonable considering the means of transportation and the distance to be traveled

10   to the nearest available such magistrate judge." *Pimental*, 755 F.3d at 1100.

11        In *Corley v. United States*, 556 U.S. 303, 322 (2009), the Supreme Court reaffirmed

12   the applicability of the *McNabb-Mallory* Rule and held that § 3501(c) modified that rule

13   without supplanting it.    The Court established a two-part test for applying the

14   *McNabb-Mallory* rule in light of the § 3501(c) six-hour safe harbor period.  First, a district

15   court must determine whether the defendant confessed within six hours of arrest, unless a

16   longer delay was reasonable considering the means of transportation and the distance to be

17   traveled to the nearest available magistrate judge.  *Pimental*, 755 F.3d at 1101 (quoting

18   *Corley*).  A confession is admissible, so long as it is voluntary,  if it either came within that

19   six-hour period or if a longer delay (*i.e.,* beyond six hours) was reasonable considering the

20   means of transportation and the distance to be traveled to the nearest available magistrate

21   judge.  *Id*.   If a court finds both that (a) the confession occurred before presentment and

22   beyond six hours from arrest and (b) a delay beyond six hours was unreasonable considering

23   the means of transportation and the distance to be traveled to the nearest available magistrate

24   judge, only then must the court proceed to the second part of the *Corley* test to determine if

25   the confession is admissible.

26        The second part of the *Corley* test requires the court to decide whether the delay in

27   presentment (aside from the means of transportation and the distance to be traveled to the

28   nearest available magistrate judge) was unreasonable or unnecessary under the

1   *McNabb-Mallory* cases.[11]  *Id.*  There are three categories of reasonable delays apart from

2   transportation, distance, and the availability of a magistrate judge: (1) delays for urgent

3   humanitarian reasons; (2) delays due to the unavailability of government personnel and

4   judges necessary to completing the arraignment process; and (3) delays necessary to

5   determine whether a suspect should be criminally charged.  *Valenzuela-Espinoza*, 697 F.3d

6   at 752.  As discussed *infra*, this Court finds that delay in bringing the defendant to his Initial

7   Appearance was reasonable considering the means of transportation and distance to be

8   traveled to the nearest available magistrate judge; for that reason, the Court need not address

9   the three other categories of reasonable delays under the *McNabb-Mallory* cases.

10      There are three Ninth Circuit cases, all involving District Courts located near the

11   United States-Mexico border, which are directly relevant to the presentment issue in the case

12   at hand: *United States v. Gamez*, 301 F.3d 1138 (9th Cir. 2002), *United States v.*

13   *Valenzuela-Espinoza*, 697 F.3d 742 (9th Cir. 2012), and *United States v. Pimental*, 755 F.3d

14   1095 (9th Cir. 2014).  *Gamez* and *Valenzuela-Espinoza* were appeals from this District (and

15   Division) and *Pimental* was an appeal from the Southern District of California (San Diego

16   Division).  With respect to the first part of the *Corley* test discussed above, all three cases

17   turn on the timing of the arrest, the proximity of the location of the arrest to the nearest

18   magistrate judge, and that judge's  availability/calendar.

19      In *Gamez* (a pre-*Corley* case), the defendant was arrested on June 3, 1998, after

20   admitting to entering the United States illegally.  301 F.3d at 1141.  He was placed in a

21   holding cell at the Nogales Port of Entry at 7:30 a.m. where he remained for the next 31

22   hours.  *Id.*  He was questioned on three separate occasions by law enforcement on June 3rd

23   and June 4th.  *Id.* at 1141-1142.  The questioning related to his involvement in the shooting

24   and killing of a Border Patrol Agent who had approached the defendant and three other men

25   who were suspected of carrying back packs of marijuana on the night of June 2, 1998.  *Id.*

26   The defendant had his Initial Appearance at 2:00 p.m. on June 4, 2015.  *Id.* at 1142.  Law

27

28      [11] If the delay was unreasonable or unnecessary, even a voluntary confession must be
suppressed.  *Id.*

1    enforcement failed to take the defendant to a magistrate judge on June 3rd because the first

2    Spanish-speaking FBI agent did not arrive to the Border Patrol until 10:00 a.m.  *Id*.  Based

3    on court policy/procedure, it was too late to schedule an Initial Appearance before the

4    magistrate judge at 2:00 p.m. on June 3rd.  *Id*. at 1143.

5         The defendant claimed that his statements to law enforcement during his 31-hour

6    detention should be excluded because they were the product of pre-arraignment delay under

7    Rule 5 of the Federal Rules of Criminal Procedure.  *Id*.   The Ninth Circuit affirmed the

8    district judge's conclusion that the delay in presentment, while outside the six-hour safe

9    harbor provision of 18 U.S.C. § 3501, was reasonable under the circumstances.  *Id*.  The

10   court reasoned that the defendant did not speak English and could not have been interviewed

11   prior to 10:30 a.m. on the first day of his detention when the first Spanish-speaking FBI agent

12   arrived at the Border Patrol station.  *Id*.  Moreover, it was impossible to determine with what

13   kind of offense the defendant would be charged prior to interrogating him.  *Id*.  Finally, the

14   court noted that the U.S. District Court in Tucson requires advance notification by 10:30 a.m.

15   of each defendant who will appear at that day's Initial Appearance at 2:00 p.m.  *Id*.

16        In *Valenzuela-Espinoza*, the Ninth Circuit dealt directly with a challenge to the

17   Tucson U.S. District Court's  advance notification requirement for Initial Appearances.  The

18   court held that this notification requirement cannot by itself create a reasonable delay for

19   purposes of 18 U.S.C. § 3501, Federal Rule of Criminal Procedure 5(a), or *Corley*.

20   *Valenzuela-Espinoza*, 697 F.3d at 750-751.

21        In that case, the defendant was arrested at approximately 11:15 a.m. on March 5, 2008

22   at a house in Tucson, Arizona, after agents determined that he was illegally present in the

23   United States.  *Id*. at 746.  Agents had been conducting surveillance of the house since the

24   prior day based on a tip from an informant that suspicious activity was occurring.   *Id*.

25   Agents decided to do a "knock and talk" on the morning on March 5, 2008.  *Id*.  As agents

26   were positioning themselves around the house,  the defendant tried to run from the residence

27   but then went back inside.  *Id*.  An agent could smell burning marijuana as he approached the

28   carport.  *Id*.  The agent knocked on the door to a storage room at the back of the carport and

announced himself as law enforcement. *Id.* The defendant opened the door and complied with the agent's directions to step out of the room. *Id.* It was at that time that agents learned that the defendant was illegally present in the United States and that there was more than ten pounds of marijuana in the house. *Id*.

Because agents decided to obtain a search warrant for the house, they guarded the house to make sure no one left or entered until the warrant was obtained. *Id*. A search warrant was obtained at 3:25 p.m. and was executed at 4:00 p.m. *Id*. A large quantity of marijuana, two handguns, a digital scale, and several cell phones were seized from the residence. *Id.* During this time, the defendant was detained at the residence. *Id*. He was brought to an ICE station around 5:00 p.m. and questioned at 7:32 p.m. after being advised of his Miranda rights. *Id*.

The defendant filed a motion to suppress his statements based upon the delay in presenting him to a magistrate judge. *Id*. at 747. The district court found that there had not been a *McNabb-Mallory* violation based on the delay in presentment. *Id*. The court found that the delay in presenting the defendant was reasonable because it was the result of the agents' other legitimate law enforcement duties to secure the scene and obtain a search warrant. *Id*. The court also took judicial notice of the fact that "it is the policy that paperwork for initial appearances before the duty magistrate is required . . . not later than 10:30 a.m. on the morning of the appearance unless exceptional circumstances are present." *Id.* Because the defendant had not been arrested until 11:15 a.m., he could not have been processed in time for the 2:00 p.m. Initial Appearance. *Id*.

The Ninth Circuit reversed the district court and found a *McNabb-Mallory* violation. Given that there was no dispute that the defendant's confession occurred before presentment and beyond the six-hour safe harbor in 18 U.S.C. § 3501, the court first considered whether "a longer delay was reasonable considering the means of transportation and the distance to be traveled to the nearest available magistrate." *Id*. at 749. The court noted that the nearest available magistrate conducted a daily Initial Appearance calendar at 2:00 p.m. and was located only ten miles from the house where the defendant was arrested. *Id.* The court

1   further noted that nine law enforcement officers were involved in the "knock and talk" that
2   led to the arrest and there was simply no reason for delay due to the means of transportation
3   and distance to be traveled since any number of agents could have transported the defendant
4   for court at 2:00 p.m.   *Id*.

5          The court then turned to the District Court's advance notification policy for Initial
6   Appearances.  The court found that regardless of whether this policy was a proper subject for
7   judicial notice,[12] the 10:30 a.m. requirement, standing alone, does not establish that a delay
8   beyond six hours was "reasonable considering the means of transportation and the distance
9   to be traveled to the nearest available magistrate." *Id*. at 750.  The court held that concluding
10  otherwise would ignore *Corley's* instruction that delays must be reasonable.  *Id*.  The court
11  noted that "if the availability of a magistrate is determined solely by an arbitrary notification
12  deadline, nothing prevents a district court from moving that deadline so early in the day that
13  it renders the prompt presentment requirement meaningless." *Id*.  The court concluded that
14  an internal policy agreed upon by the prosecutors and magistrate judges cannot trump the
15  requirements of a federal statute and the Rules of Criminal Procedure. *Id*. at 751.  Rather,
16  whether a delay was reasonable due to distance, means of transportation, or the availability
17  of the nearest magistrate must be determined by the facts of each case.  *Id*.

18         The *Valenzuela-Espinoza* court distinguished its earlier decision in *Gamez* because
19  that court did not specifically consider the reasonableness of the 10:30 a.m. notification
20  policy on its own.  *Id*.  Rather, the presentment delay in *Gamez* stemmed from the two related
21  facts: (1) an arrest at the Nogales Border Patrol Station over 60 miles from the district court
22  in Tucson; and (2) the defendant only spoke Spanish and agents could not question the
23  defendant to determine what offense he would be charged with until the Spanish speaking
24  FBI agent arrived.  *Id*.  By contrast, the *Valenzuela-Espinoza* court noted that in this case the

25

26         [12]  Neither the District Court nor the government cited to any official court rules or records
27  that would make the advance notification policy a proper subject for judicial notice.  Subsequent to
    *Valenzuela-Espinoza*, a General Order was adopted for the U.S. District Court for the District of
28  Arizona (Tucson Division) setting forth the advance notification requirement for Initial
    Appearances.

1    defendant was arrested ten miles from the district court and three hours before the scheduled

2    Initial Appearance calendar.  *Id*.  For those reasons, the delay in presentment was not

3    reasonable given the means of transportation and distance to be traveled to the nearest

4    available magistrate.  *Id*.

5         The court then turned to the second part of the *Corley* presentment inquiry, whether

6    any of the three categories of reasonable delay apart from transportation, distance, and the

7    availability of a magistrate were applicable.  *Id*. at 752.  The court concluded none of these

8    three categories for reasonable delay had been demonstrated.  First, there was no suggestion

9    that the delay was the result of humanitarian reasons.  *Id*.  Second, there were plenty of

10   agents available to transport the defendant to Initial Appearances at 2:00 p.m. on the day of

11   his arrest.  *Id*.  Finally, it was not necessary to conduct any additional investigation to

12   determine whether the defendant could be criminally charged given that the agents learned

13   that the defendant was illegally present in the United States when they arrested him at 11:15

14   a.m., and had substantial evidence of his involvement in a drug offense – including his

15   admission that there was more than ten pounds of marijuana in the house – prior to the

16   execution of the search warrant. *Id*.

17        In *Pimental*, the Ninth Circuit again dealt with the presentment issue in the context

18   of an early morning arrest that occurred in close proximity to the district court and hours

19   before the Initial Appearance calendar was to begin that day.  On Friday January 11, 2011,

20   the defendant entered into the United States at the San Ysidro Port of Entry as a passenger

21   in a vehicle which was found to contain 71 kilograms of marijuana, including three bundles

22   in the passenger seat where he was seated.  *Pimental*, 755 F.3d at 1097.  The defendant and

23   the driver of the vehicle were arrested at 9:30 a.m.  *Id*.  At 11:52 a.m., the defendant was

24   brought to an interview room and read his Miranda rights. *Id*.  He initially waived his rights

25   but ultimately asked for an attorney.  *Id*. at 1097-1098.

26        After the interview ended at 11:54 a.m., the defendant was not transported to the

27   district court in San Diego for his Initial Appearance, which occur daily at 2:00 p.m. *Id*.  at

28   1098.  Instead, the defendant was kept in a holding cell at the Port of Entry because no beds

1   were available at the federal detention center in downtown San Diego.[13]  *Id*.  The defendant

2   remained in custody at the Port of Entry from Friday morning until Sunday morning, when

3   an agent transported him to the federal detention center in San Diego, a fifteen to twenty

4   minute drive.  *Id*.  at 1098-1099.  During this drive, the defendant asked the transporting

5   agent some questions about how long his sentence would be.  *Id*.  at 1099.  After some

6   discussion between the agent and the defendant, the defendant decided to make a statement

7   in which he confessed to his role in trying to cross the narcotics.  *Id*.  After making his

8   statement, the defendant was booked into the federal detention center on Sunday, and had his

9   Initial Appearance on Tuesday, January 18, 2015 (as Monday was a federal holiday).  *Id*.

10   The defendant filed a motion seeking to suppress his incriminating statements under

11   Fed. R. Crim. Pro. 5(a) and *McNabb-Mallory*, because of the unreasonable or unnecessary

12   delay in presenting him to a magistrate judge following his arrest.  *Id*.  The district court

13   denied the motion but the Ninth Circuit reversed finding a *McNabb-Mallory* violation.  The

14   Ninth Circuit quickly dispensed with the first part of the *Corley* test, finding that the delay

15   in the defendant's presentment to the nearest magistrate judge, who was holding an Initial

16   Appearance calendar on the afternoon of the defendant's arrest, was not reasonable given that

17   this judge was located only 17 miles (or 22 minutes) from where the defendant was arrested.

18   *Id*. at 1101.

19   The court also rejected each of the three categories of reasonable delays apart from

20   the transportation, distance, and availability of a magistrate judge  – *i.e*., the second part of

21   the *Corley* test.  First, there was no claim that the delay was for humanitarian reasons.  *Id*.

22   Second, the delay was not due to the unavailability of government personnel and judges

23   necessary to the presentment process as there was no suggestion that there were not enough

24   agents to transport the defendant the short distance to court for the 2:00 p.m. Initial

25   Appearance calendar.  *Id*. at 1101-1102.  Finally, the delay was not necessary to determine

26

27   ───────────────

28   [13] At 5:00 p.m., an agent signed a criminal complaint against the defendant and the driver
    of the vehicle which alleged importation of marijuana.  The complaint was signed by a magistrate
    judge at 8:14 p.m.

1  whether the defendant could be criminally charged given that the defendant was in a vehicle

2  loaded with over 150 pounds of marijuana, including three packages found in the passenger

3  seat where he was sitting.   *Id*. at 1102.   The court noted that it understood why law

4  enforcement wanted to strengthen its case against the defendant, but concluded that the delay

5  in presenting him to the magistrate in order to interrogate him was unreasonable.   *Id*.

6  **The Case at Hand**

7  There is no dispute that the defendant's statements made on March 26, 2015 (the day

8  after his arrest) were made before presentment and beyond the six-hour safe harbor in 18

9  U.S.C. § 3501.  Thus, under *Corley*, this Court must first determine whether "a longer delay

10  [in presenting the defendant for his Initial Appearance] was reasonable considering the

11  means of transportation and the distance to be traveled to the nearest available magistrate."

12  This Court concludes that the delay based on these factors was reasonable and, for that

13  reason, the motion to suppress should be denied.

14  The defendant's primary argument in support of suppression of his March 26, 2015

15  statement due to the delay in his presentment is that the district court's advance notification

16  procedure for Initial Appearances prevented Agent Oliveira from transporting the defendant

17  to that hearing on the day of his arrest.  However, unlike in *Valenzuela-Espinoza*, the district

18  court's advance notification procedure for Initial Appearances is irrelevant in the analysis of

19  the reasonableness of the delay in the defendant's presentment.  To be sure, Agent Oliveira

20  testified that he made no attempt to contact the court to schedule an Initial Appearance

21  because it was well after the 10:30 a.m. notification deadline when he finished his interview

22  of the defendant.[14]   (Tr. 30.)   Nevertheless, as discussed below, the evidence at the

23

24  [14] Agent Oliveira certainly could have called the duty judge's chambers to ask the court to make an exception to this notification requirement and schedule this defendant's Initial Appearance

25  later in the afternoon on March 25, 2015.  That possibility raises the more interesting issue -- not yet addressed by the Ninth Circuit nor raised by the defendant -- of whether magistrate judges

26  should be available at any time during business hours on weekdays to conduct Initial Appearances for persons arrested and charged with federal offenses.  While the Ninth Circuit has held that this

27  district's advance notification requirement for Initial Appearances cannot in and of itself create reasonable delay for presentment (and has posited how this requirement could be manipulated to

28  make the presentment requirement meaningless), that Court has not held, suggested, or implied that

- 17 -

1   suppression hearing established that both the timing and location of the defendant's arrest –
2   and not the district court's advance notification procedure -  prevented the defendant from
3   being brought to court for his Initial Appearance at 2:00 p.m. on the day of his arrest.  Again,
4   that delay was reasonable under *Corley*.

5        The Court first notes that, unlike *Valenzuela-Espinoza* or *Pimental*, this case does not
6   involve a situation where the decision that a defendant could be criminally charged occurred
7   hours before Initial Appearances were scheduled for that day.  Although the defendant's
8   initial detention occurred essentially upon his arrival at the Port of Entry at 7:30 a.m., the
9   determination of whether the defendant could (and should)  be criminally charged with this
10  drug offense was not made until the defendant's interview was completed at 12:20 p.m. - a
11  little more than an hour and a half prior to that day's Initial Appearance calendar.  That
12  interview was important in determining whether criminal charges could (and should) be filed
13  for the following related reasons.

14       In *Pimental*, bundles of marijuana in the vehicle were in plain view in the passenger
15  seat where the defendant was seated, which provided ample evidence of the defendant's
16  knowledge of the narcotics in the vehicle crossing into the United States.  755 F.3d at 1103.
17  In fact, that court concluded that agents needed no further evidence to determine whether
18  they could charge the defendant with importing marijuana.  *Id*.  Similarly, in
19  *Valenzuela-Espinoza*, the court also noted that at the time of the defendant's arrest at 11:15
20  a.m., agents had sufficient information that the defendant could be charged both with illegal
21  entry into the United States and a drug offense given that the defendant both left the house
22  "in a cloud of marijuana smoke" and "told the officers there was more than ten pounds of
23  marijuana inside the house."  697 F.3d at 753.  Indeed, agents likely obtained the search
24  warrant for the house based on this very information.

25       By contrast, here, the narcotics were concealed in the firewall of the truck which

26

27  _____

28  having only one court hearing for all Initial Appearances each business day creates any presentment
    issues.  For that reason, Agent Oliveira's failure to call the court to schedule an Initial Appearance
    later in the afternoon is simply not relevant to the matter at hand.

- 18 -

1    required an x-ray of the vehicle to discover their presence. [Doc. 1.] In this district (like most

2    border districts), there is a "blind-mule" or "unknowing courier" defense often put forth

3    where a driver or occupant of a vehicle claims not to know that drugs were secreted - in this

4    case, well secreted - in the vehicle that is being crossed into the United States.  Indeed, the

5    defendant here made that precise claim.  [Doc.1.]  As such, an interview with an arrestee to

6    establish either knowledge of the narcotics, evidence of willful blindness of the narcotics, or

7    evidence undercutting the denial of knowledge of the narcotics, is often critical to a decision

8    of whether a defendant can be criminally charged in this "blind-mule" or "unknowing

9    courier" scenario.  In fact, Agent Oliveira testified that he ended the interview because he felt

10   that he acquired sufficient information during that interview - albeit not a confession *per se*

11   – to establish probable cause to criminally charge the defendant. (Tr. 26-27, 67, 88.)  Thus,

12   while the defendant does not make this contention, there can be no doubt that the temporal

13   trigger in the presentment analysis is the time the interview was concluded (*i.e.*, 12:20 p.m.)

14   and not when the drugs were discovered and the defendant was detained (*i.e.*, between 7:30

15   a.m. and 8:00 a.m.).[15]

16          Additionally, but related to the temporal component discussed above, the instant case

17   is unlike *Valenzuela-Espinoza* and *Pimental* where the arrest of those defendants occurred

18   within ten and seventeen miles of the respective courthouses in those cases.  Rather, as in

19   *Gamez*, the arrest occurred at the Nogales Port of Entry which is over sixty miles from the

20   district court in Tucson, Arizona.  Moreover, Agent Oliveira testified that the drive from the

21   Rio Rico office to the district court in Tucson is about an hour and fifteen minutes, depending

22

_____

23          [15]  Defense counsel's questioning of Agent Oliveira did suggest that it took an inordinate
24   amount of time to interview the defendant.  However, as discussed above, Agent Oliveira testified
     that he was conducting his investigation from the time he arrived at the POE until he met with the
25   defendant.   That investigation included examining the vehicle and the results of the x-ray,
     conducting and attempting to conduct the Cellebrite data extraction from the cell phones, and
26   interviewing all the Port Inspectors involved in the seizure, some of whom were performing their
     assigned duties and not immediately available to meet with Agent Oliveira. (Tr. 91-92.) Thus, there
27   is no evidence that Agent Oliveira was stalling to delay his interview of the defendant in an attempt
28   to miss the 10:30 a.m. notification deadline and avoid transporting the defendant for his Initial
     Appearance on the day of his arrest.

upon traffic. (Tr. 29.) Given the 12:20 p.m. end time of the interview where probable cause to charge the defendant with a drug offense was established, it would have been cutting it close to get the defendant to Initial Appearances by 2:00 p.m. Nevertheless, even if he could have made it to court by 2:00 p.m., Agent Oliveira testified that he could not transport the defendant directly to his Initial Appearance. (*Id.* 28.) He testified that he is duty bound to take an arrestee to the Rio Rico office for fingerprinting and to input biographical information into a computer system. (*Id.*) That process cannot be done at the Port of Entry. (*Id.*) He testified that he arrived at his office in Rio Rico at about 1:00 p.m. and his processing of the defendant took about an hour, so there was simply no way to get the defendant to court for the 2:00 p.m. Initial Appearance calendar. (*Id.* 28-29, 61, 66.)

All of these facts establish that the delay in the presentment of the defendant for his Initial Appearance was reasonable due to distance, means of transportation, and the availability of the nearest magistrate. Accordingly, the Court recommends that the motion to suppress be denied on that ground as well.

Pursuant to 28 U.S.C. §636(b)(1)(B), the parties have fourteen (14) days from the date of this Report and Recommendation to file written objections to these findings and recommendations with the District Court. Any objections and Responses to objections filed should be filed as CR 15-00768-TUC-JAS. No Replies shall be filed unless leave is granted from the District Court.

DATED this 18th day of March, 2016.

Eric J. Markovich
United States Magistrate Judge